Filed 3/24/23  P. v. Superior Court (Watson)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Petitioners,<br><br>　　v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY<br><br>　　　　Respondent,<br><br>JAMES ANTHONY WATSON,<br><br>　　　　Real Party in Interest. | No. H050025<br>(Santa Clara<br>Super. Ct. No. C1370223) |

Real party in interest James Anthony Watson was convicted of attempted murder after shooting his wife.  He successfully moved for mental health diversion (Pen. Code, § 1001.36) before his conviction became final.  The People seek a writ of mandate or prohibition ordering respondent Superior Court of Santa Clara County to vacate the diversion order.  The People argue that the judge who presided over Watson's jury trial should have heard the diversion motion, and that mental health diversion was improperly granted.  As we will explain, given the deferential standards of review that apply, we conclude the People's petition must be denied.

## I.    TRIAL COURT PROCEEDING

Because the basic facts of the offense are undisputed, we rely on the factual summary from this court's opinion reversing the original judgment and remanding for

Penal Code section 1001.36 proceedings. (*People v. Watson* (May 21, 2021, H045141) [nonpub. opn.].) We grant the People's request for judicial notice of the files from that appeal.

Watson tried to kill his wife in December 2013. He admitted shooting her. She was found with bullet wounds to her right thumb and jaw. Three of her teeth were knocked out, and surgery was necessary to remove bone fragments and a bullet fragment from her jaw.

A jury convicted Watson of attempted premeditated murder (Pen. Code, §§ 187, 664) and found true an allegation that he personally discharged a firearm causing great bodily injury. (Pen. Code, § 12022.53, subd. (d); unspecified statutory references are to the Penal Code.) Judge Daniel Nishigaya presided over the trial. A different panel of this court found no prejudicial error related to the attempted murder conviction and firearm enhancement, but reversed the judgment for two purposes: to allow Watson to move for mental health diversion; and, if the trial court denied diversion or if Watson did not successfully complete diversion, to allow the trial court to exercise its new discretion to consider striking the formerly mandatory firearm enhancement. (*People v. Watson* (May 21, 2021, H045141) [nonpub. opn.].)

Watson moved for mental health diversion in Department No. 60 of the respondent court, with Judge Julianne Sylva presiding. The prosecutor argued Judge Nishigaya should decide the motion; defense counsel argued that diversion applications are "customarily" filed in that department, and that Judge Sylva should decide the motion. Judge Sylva indicated she would decide the motion because "the former presiding judge of our Criminal Department established Department 60 as the department to hear the mental health diversion motions."

## A. MENTAL HEALTH EXPERT REPORTS

Reports from two mental health experts were filed with the diversion motion. Social worker Michelle Nelson interviewed Watson in March 2022. Watson recalled

experiencing anxiety and depression as early as 12 years old but declined treatment at that time. He had worked as a delivery and garbage truck driver. He had a history of substance abuse, including methamphetamine and opiates. He became addicted to opiates in 2000 after taking them following a back injury. Watson reported that his wife was diagnosed with schizophrenia in 2000. He was her sole caregiver. Her schizophrenia was symptomatic and untreated. The stress of caring for his wife reportedly triggered his mental health symptoms and worsened his addiction. He engaged in therapy for substance abuse and mental health through Kaiser while he was employed. Watson was laid off from a truck driving job in 2013, apparently for threatening to bring an AK-47 and grenades to work. He reported that his depression and addiction worsened under the stress of the social and financial obligations required to care for his wife. Watson reported being in substance withdrawal and not having slept for the three days before the offense. He decided to kill his wife and himself because he was concerned about her well-being without him there to care for her.

Nelson reported Watson suffered from major depressive disorder, with amphetamine and opiate use disorders. He was at severe risk of substance abuse relapse, without treatment. The depressive disorder symptoms included "depressed mood (hopelessness, sadness), psychomotor retardation, fatigue, feelings of worthlessness and overwhelming guilt, recurrent, [and] persistent thoughts of death (including ideation)." Watson reported that he continued to feel depressed while in custody "despite being on a regimen of psychiatric medications in custody and doesn't report a difference when on medications versus when not." Nelson attributed that to Watson's "in-custody status, pessimism, or lack of optimism for his future or physical health related issues (i.e., chronic back pain following an injury, sleep apnea, Parkinson's Disease, essential hypertension, asthma, and type 2 diabetes)." Nelson noted Watson had social supports including his mother, a brother of his ex-wife, and friends from previous jobs. Residing with his mother upon release, however, was not viable because of Watson's pattern of

3

engaging in dependent relationships with others that undermined from his own recovery efforts.

Nelson recommended that Watson be placed in "treatment-oriented living arrangements, with others focused on recovery, where he can improve his self-esteem and self-worth independent of others." Specifically, Nelson recommended "intensive mental health residential treatment" at Muriel Wright Crisis Residential Treatment, where Watson would receive "24/7 supervision, intensive mental health treatment, including individual and group therapies focusing on CBT, DBT, life/social skill building, trauma, anger management and co-occurring topics." Following that program, Watson would transition to "Muriel Wright Substance Use Treatment ... where he will reside for 30-90 days and receive intensive substance use treatment including groups (relapse prevention, identifying triggers, cravings and coping skills, and patterns of use), individual drug counseling, medication management, linkage to community resources and referrals to outpatient drug treatment resources." Those inpatient programs would be followed by outpatient treatment through Community Solutions Forensic Assertive Community Treatment, the county's "highest level of outpatient treatment." That treatment program offers "psychiatry support, individual and group therapies, intensive case management and linkage to community resources (i.e., employment services, medical services, etc.)."

Clinical psychologist Carolyn Murphy interviewed Watson in January 2022 and prepared a report. Watson "presented as a neatly groomed man who was alert and fully oriented to person, place, time, and situation." He appeared "situationally stressed and somewhat pessimistic," but Murphy opined this was "related to his current circumstance, as well as to his chronic experience of depression." Watson's description of his relationship with his ex-wife and the circumstances of the crime was generally consistent with the information contained in Nelson's report. Watson reported that his ex-wife did not want to take medication for her mental health disorder, which made her "increasingly disorganized and incapable of taking care of herself." She had to be temporarily

4

hospitalized multiple times under Welfare & Institutions Code section 5150. Watson coped with the stress of caring for her by abusing methamphetamine and opiates. Watson told Murphy he "became suicidal, and in fearing that he would be leaving his wife behind with no[ ]one to care for [her], made the fateful decision to attempt to take both of their lives, but failed."

Murphy noted Watson was being treated with "Cymbalta, Abilify, and Buspar," but was nonetheless presenting with "depressed mood, apathy, anhedonia, feelings of hopelessness, and general sadness." Murphy opined that this continued depression could be due to the "absence of intensive, co-occurring Cognitive Behavioral Therapy" (CBT). Murphy stated she examined the record of services Watson received while incarcerated and noted the counseling is generally "offered with other inmates (individual services are limited), some of whom Mr. Watson has been able to befriend, but not to the level of trust necessary to make optimal use of treatment." She concluded Watson had not received the "intensive level of services necessary to address his mood disorder." She also noted that prison is a "high-stress environment not conducive to effective treatment." Murphy further explained that the types of medication and treatments available in prison are limited.

Murphy conducted a risk assessment using the History Clinical Risk - 20 (HCR-20), Version 3. The assessment rates patients in three areas: historical risk, clinical risk, and environmental risk. Murphy assessed Watson in the low-moderate range for historical risk, based on his mental disorder, history of substance abuse, and the past incident of violence. Murphy noted Watson otherwise had the capacity for strong relationships, a strong work history, no underlying personality disorder, no childhood trauma, and no current treatment compliance issues. Murphy assessed Watson in the low-moderate range for clinical risk. Watson was still feeling depressed, but for the past six months had not engaged in violence, self-harm ideation, or disruptive behavior. His affect appeared stable and he was aware of the need for treatment. Murphy assessed

5

Watson in the low-moderate range for environmental risk because he had a plan for treatment, was stable (though not in full remission), was fully compliant with treatment, was "demonstrating improving insight into the need for ongoing use of medication," and was "open to continued care in the form of more intensive psychotherapy and CBT, to help address his ongoing struggle with depression." Murphy assessed Watson's overall risk for violence as low-moderate, assuming he remained treatment-compliant.

## B. OTHER EVIDENCE

The prosecution filed voluminous exhibits in opposition to the diversion motion, including an 18-volume reporter's transcript from Watson's jury trial and over 21,000 pages of Watson's medical records. Judge Sylva indicated she would review all of Watson's trial testimony, as well as that of any witness who submitted a letter in support of diversion. The judge would also review the "entirety of the medical record." Letters from Watson's ex-wife's brothers Gaston and Miguel were among the exhibits submitted by the prosecution; both opposed diversion and one indicated his sister was afraid Watson would find her and "finish what he tried to do."

Judge Sylva heard testimony over the course of two hearings. Matthew Fisk, Director of Pretrial Services, testified about his interview with Watson and about available services and supervision if the court were to grant diversion. He described Watson as forthcoming and cooperative in the interview. Fisk recommended that Watson be subject to electronic monitoring if released, including continuous alcohol monitoring and GPS tracking with exclusion zones.

Several character witnesses supported Watson's diversion motion, including friends, his mother, two of his brothers, and his ex-wife's brother Jaime. They generally expressed the view that Watson would not be a threat if released, and offered to support him. Jaime testified about Watson's good character and the extent of his sister's mental health issues. He indicated his sister was by that time in a mental hospital. He believed Watson "deserves a chance like everybody else."

6

## C. TRIAL COURT DECISION

The trial court granted diversion, making detailed oral findings after hearing argument from counsel. The court found Watson had qualifying mental health diagnoses, namely major depressive disorder and substance use disorder (the latter was in remission at the time of the diversion hearing). The court found that the mental disorders were a significant factor in the offense, reasoning that on the day of the offense Watson was depressed because he had lost his job and its accompanying health insurance for both him and his wife. Watson's wife "was no longer the person he married" because of her mental illness, and he was her sole caregiver. Caring for her was difficult because she often left the house and wandered late at night, sometimes requiring Watson to call the police to help search for her. The court indicated it "did not see any evidence of violence or hear anything about arguing or volatility in the relationship as is commonly seen in cases where one partner hurts another." The court noted Watson experienced chronic low back pain after a spinal fusion surgery, which led to an opiate addiction. While in withdrawal from opiates, and under the stress from losing his job, Watson decided to end his life and his wife's because he feared no one would care for her without him. The court acknowledged the "crime itself [was] brutal," but found it "compelling" that Watson himself called the police and reported the shooting.

Judge Sylva found the two qualified mental health experts' reports relevant and compelling. The court found that the recommended mental health treatment plan would meet Watson's specialized mental health treatment needs. That plan consisted of residential mental health treatment (apparently a 21-day program) followed by residential substance abuse treatment for 30 to 90 days. Once he completed those programs, Watson would transition to outpatient treatment for behavioral health support, which was the highest level of mental health care available in the county for those who are out of custody and not under conservatorship. In that outpatient program, Watson would have access to "case managers, medication management, and help in getting disability and

7

other general assistance, help in getting transportation and housing, go back to school." Supplementing that support "would be any assistance he's been promised by friends and family, as well as the social worker at the Public Defender's Office, and by Pretrial Services." The court indicated it would order "GPS tracking for [Watson] and limit the area where [he] will be residing while in treatment, and later exploring other limitations or expansions as the case may be." The court's final substantive finding was that Watson would not pose an unreasonable risk of danger to public safety. The court acknowledged Watson's past threats, including one to a cellmate and another when he "made a threatening, frustrated statement about bringing an AK-47 and a grenade to work." But the court reasoned that Watson committed an "intimate partner offense that was fueled by a limited set of circumstances that had never happened before and that I doubt will ever happen again."

The trial court suspended criminal proceedings and granted mental health diversion. The trial court temporarily stayed its decision to allow the People to seek writ relief in this court. We initially denied the People's petition summarily. The People petitioned for review in the Supreme Court, which stayed the diversion order and ultimately granted review. (*People v. Superior Court (Watson)* (August 17, 2022, S274802).) The Supreme Court transferred the matter to this court with directions and we issued an order to show cause, to which Watson filed a return, and the People filed a reply.

## II.    DISCUSSION

### A. NO ERROR IN JUDGE SYLVA HEARING THE DIVERSION MOTION

Watson moved for mental health diversion in Department No. 60 of the respondent court, with Judge Sylva presiding. The prosecutor stated the "matter needs to be heard in front of Judge Nishigaya," arguing, "if the question is if this [d]efendant, based on the facts of this case, is entitled to mental health diversion, then the best person to deal with it is the judge who heard all the evidence at trial, the judge who heard from

8

not one but three [d]efense experts on [d]efendant's mental health issues at the time of the offense, the judge who heard the [d]efendant testify about his mental state and his thought process throughout the offense." However the prosecutor cited no authority for that being required. Judge Sylva decided to retain the matter, explaining that "the former presiding judge of our Criminal Department established Department 60 as the department to hear the mental health diversion motions."

A trial court has the "inherent authority and responsibility to fairly and efficiently administer all of the judicial proceedings that are pending," including the power to " 'control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.' " (*People v. Engram* (2010) 50 Cal.4th 1131, 1146.) One limitation on that inherent authority is that a trial court may not "adopt local rules or procedures that conflict with statutes or with rules of court adopted by the Judicial Council, or that are inconsistent with the Constitution or case law." (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1351, superseded by statute on other bases as stated in *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 840.)

Judge Sylva had the inherent authority to decide the diversion motion. Judge Nishigaya's greater familiarity with the trial record, standing alone, does not negate Judge Sylva's ability to hear the motion. Because no law or rule presented to Judge Sylva mandated that she transfer the matter to Judge Nishigaya, the People fail to demonstrate error.

We are not persuaded by the authorities cited in the People's petition. In *Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1253–1255 (*Peracchi*), the Supreme Court interpreted Code of Civil Procedure section 170.6 and concluded that on remand for resentencing after a successful appeal a defendant cannot use that section to disqualify the judge who presided over the trial. But neither resentencing nor the application of Code of Civil Procedure section 170.6 is at issue in this case. *Peracchi* did not announce

9

a rule that would conflict with Judge Sylva's authority to retain the matter in her department.

Similarly unpersuasive is the People's reliance on *People v. Braley* (2020) 52 Cal.App.5th 680 and *Andrew M. v. Superior Court* (2020) 43 Cal.App.5th 1116, 1126, which also involved Code of Civil Procedure section 170.6. Disqualification rules are not implicated here, and nothing in those opinions amounts to a law or rule that would override Judge Sylva's authority to decide the diversion motion.

The People raise a new argument in their reply brief, citing a Santa Clara County Superior Court local criminal rule stating, "Post-trial motions, motions for new trial and other matters related to contested cases must be set and heard in the department where the judge who heard the matter is currently sitting." (Citing Super. Ct. Santa Clara, Local Rules, former criminal rule 9(R)(1).)[1] The People forfeited that argument by neither presenting it to Judge Sylva nor raising it in the petition in this court. (*Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591.) We express no opinion on the application or effect of that rule if properly raised in a future case presenting the same procedural issue.

### B. NO ERROR IN GRANTING DIVERSION

At the time Judge Sylva granted diversion, former section 1001.36 provided that a court may grant pretrial diversion to an individual meeting the following criteria: the defendant suffers from a qualifying mental disorder; the mental disorder was a "significant factor in the commission of the charged offense": the defendant's mental disorder symptoms would respond to treatment based on the opinion of a qualified mental health expert; the defendant consents to diversion and waives the right to a speedy trial; the defendant agrees to comply with treatment as a condition of diversion; and the "court

---

[1] The local rules appear to have been amended, effective January 1, 2023, and only the current version is available online. The language quoted by the People is now in local criminal rule 7(R)(1). ([https://www.scscourt.org/general_info/rules/pdfs/Criminal.pdf] (as of March 24, 2023), archived at: **https://perma.cc/C66P-RWSX**.)

10

is satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (Former § 1001.36, subd. (b)(1)(A)-(b)(1)(F); Stats. 2019, ch. 497, § 203.) The statute also requires a finding that the "recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant." (Former § 1001.36, subd. (c)(1)(A).) We review the trial court's factual findings for substantial evidence, and we review the conclusion as to the eligibility criteria for abuse of discretion. (*Negron v. Superior Court* (2021) 70 Cal.App.5th 1007, 1016.)

### 1. Qualifying Mental Disorder

The People do not contest the finding that Watson suffers from qualifying mental disorders, namely major depressive disorder and substance use disorder that was in remission.

### 2. Disorder as a Significant Factor in Committing the Charged Offense

Judge Sylva found that Watson's depression and substance abuse disorders were a significant factor in committing the charged offense. The court found that Watson was depressed and in withdrawal from opiates. The stress of caring for his wife who had a serious mental health disorder, coupled with the stress of losing his job and associated health insurance, led Watson to decide to kill his wife and then himself. Those findings are supported by substantial evidence in the form of the two mental health expert's reports and Watson's trial testimony: Watson testified at his jury trial consistent with Judge Sylva's account of the time period leading up to the attempted murder; Nelson's and Murphy's reports recounted Watson's version of the events, and nothing in the reports indicates either expert disbelieved Watson's account.

The People's arguments challenging Judge Sylva's decision on this eligibility factor merely point to other evidence in the record that could have supported an alternative conclusion. They note, for instance, that in convicting Watson of attempted murder, the jury apparently rejected his claim that he was suicidal on the night of the

11

incident. They also assert that "the duly authorized finders of fact" were "the sworn jur[ors] in the trial." But the jury was the finder of fact only for Watson's guilt; Judge Sylva was the finder of fact on the diversion question. The jury was not presented with nor instructed on the section 1001.36 criteria. And any credibility determination the jury made as to Watson's guilt was not binding on Judge Sylva in ruling on diversion eligibility.

The People also argue Judge Sylva "failed to acknowledge" evidence they presented indicating that Watson admitted falsely claiming some mental health symptoms while in prison to gain preferential treatment. But we will not presume the trial court overlooked evidence merely because it did not discuss every piece of evidence when making findings. Judge Sylva apparently credited Watson's evidence over the People's on this point, and we will not reweigh the evidence or second-guess credibility determinations. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.)

### 3. Whether Symptoms Would Respond to Treatment

Two experts interviewed Watson and prepared reports. Michelle Nelson recommended inpatient mental health and substance abuse treatment, followed by outpatient treatment. Implicit in that recommendation was that Watson's symptoms would respond to treatment. Nelson acknowledged that Watson reported continuing to feel depressed in prison despite medication, but opined it could be due to his "in-custody status, pessimism, or lack of optimism for his future or physical health related issues." Carolyn Murphy conducted a risk assessment and opined that Watson was at a low-moderate risk for violence. Murphy acknowledged Watson reporting that he continued to feel depressed despite taking medication, but she noted the high-stress prison environment and lack of individualized services available in prison. Judge Sylva found those experts' opinions relevant and compelling, and concluded "there was nothing to refute" their opinions. The foregoing is substantial evidence supporting the trial court's conclusion.

The People argue Judge Sylva failed to address other evidence in the record that would support an alternative conclusion, such as references in Watson's medical records about past treatment being unsuccessful. Here again, the existence of evidence supporting an alternative conclusion does not compel reversal when substantial evidence supports the trial court's decision. Both Nelson and Murphy acknowledged that Watson's symptoms had been resistant to treatment, but both also explained that could be due to the high-stress prison setting and other factors.

The People attack Murphy's statement in the report that individual therapy was limited in the prison setting, citing medical records of individual therapy provided in prison. But Murphy did not suggest that individual therapy was entirely unavailable in prison, and she identified other barriers to successful treatment in a prison setting, such as a limited "formulary of medications" and the lack of specialized services such as electroconvulsive shock therapy.

The People point to Watson's mental health struggles predating the commitment offense, arguing it shows his symptoms "are intractable and simply do[] not respond to medication or counseling, regardless of his environment." But past is not necessarily prologue, and Murphy opined Watson was "demonstrating improving insight into the need for ongoing use of medication," and was "open to continued care in the form of more intensive psychotherapy and CBT, to help address his ongoing struggle with depression." We acknowledge there is no guarantee Watson's treatment will be successful, but that is not the standard for diversion established by the Legislature.

### 4. Consent to Treatment

The People do not dispute Watson's consent to treatment.

### 5. Agreement to Comply with Treatment

The People argue Judge Sylva "failed to make a requisite finding that [Watson] made *a prima facie* showing he would comply with treatment as a condition of probation." But that is not a required finding. Former section 1001.36, subdivision

13

(b)(1)(E) requires a finding that the "defendant agrees to comply with treatment as a condition of diversion." Judge Sylva was entitled to rely on Watson moving for diversion, complying with the various expert interviews related to the proceedings, and expressing to Murphy being "open to continued care in the form of more intensive psychotherapy and CBT, to help address his ongoing struggle with depression" to satisfy this factor.

The People point to instances during Watson's incarceration when he has refused treatment, arguing his "behavior in custody makes it plain he would not comply with any proposed terms of diversion." Judge Sylva resolved conflicting evidence and implicitly concluded Watson agreed to comply with treatment; we are not permitted to second guess that conclusion given the state of the record.

The People cite *People v. Pacheco* (2022) 75 Cal.App.5th 207, 213–214 (*Pacheco*), which involved review of a trial court's decision *denying* diversion, and the factor at issue was the trial court's finding that Pacheco posed an unreasonable risk of danger to public safety. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [cases are not authority for propositions not considered].) Nor is *People v. Watts* (2022) 79 Cal.App.5th 830, cited in the People's reply, helpful because it similarly involved the denial of diversion based on other section 1001.36 criteria. (See *id.* at pp. 836–837 [affirming denial of diversion for "multiple reasons," including that the defendant's disorder was not a significant factor in committing the offense and that the case plan was insufficient].)

### 6. Risk of Danger to Public Safety

Judge Sylva determined Watson did not pose an unreasonable risk of committing a super strike if released. (See former § 1001.36, subd. (b)(1)(F); § 1170.18, subd. (c) [defining " 'unreasonable risk of danger to public safety' " as an "unreasonable risk that the petitioner will commit a new violent felony within the meaning of" § 667, subd. (e)(2)(C)(iv)].) Judge Sylva acknowledged Watson's history, and noted Watson

14

made "statements to others that his [cellmate] in prison was annoying him and he made a threatening comment ... about bringing an AK-47 and a grenade to work." But Watson had no violent criminal conviction history before the attempted murder conviction. Dr. Murphy conducted a risk assessment and concluded Watson posed a low-moderate risk of violence if released, assuming he was compliant with treatment. Her report notes that "existing risk assessment methods cannot specifically predict what type of behavior may or may not occur in the future," explaining Watson would pose a low-moderate risk of violence generally if released, rather than a low-moderate risk of committing a particular violent felony. Several individuals testified about their willingness to support Watson if the court granted diversion. And a main stressor that Judge Sylva found motivated the attempted murder—having to care for a person with an untreated mental health disorder—would not be present if Watson were released because his ex-wife is in a treatment facility and Watson would not be allowed near her. The People have not demonstrated an abuse of discretion on this record.

The People attack the trial court's finding that it "did not see any evidence of violence or hear anything about arguing or volatility in the relationship as is commonly seen in cases where one partner hurts another." The People note that Watson admitted during his testimony at the jury trial that at some point during his marriage he suggested he should shoot himself and his ex-wife, and that his firearms were taken away by the police as a result. The People did not discuss this material at the diversion hearings, but did refer to the material in their trial court pleadings: "Defendant had also previously threatened to kill the victim, telling her that he was 'going to put her out of her misery.' "

Although the attempted murder was the only violent encounter between Watson and his ex-wife, Judge Sylva's finding of no arguing or volatility is not supported by the record. But the People have the burden to " 'establish an abuse of discretion *and prejudice*.' " (*Pacheco*, *supra*, 75 Cal.App.5th at p. 213; *People v. Bunas* (2022) 79 Cal.App.5th 840, 866.) Given the evidence otherwise supporting Judge Sylva's

15

decision, the People have not demonstrated a reasonable probability of achieving a more favorable result had Judge Sylva specifically addressed the threat Watson made to his ex-wife.

The People's remaining arguments would require us to reweigh the evidence, which is not our role. The People note a domestic violence lethality assessment from a 2017 probation report indicating Watson had an extreme focus on his wife at that time. Judge Sylva was entitled to credit Dr. Murphy's more recent risk assessment over the assessment from 2017. They also cite a letter from one of the ex-wife's brothers indicating she remained afraid of Watson (while another of her brothers testified in support of diversion). A rational decision maker could conclude Watson does not pose an unreasonable risk of committing a super strike, even if his victim remains afraid of him.

### 7. Whether Proposed Treatment Would Meet Watson's Needs

The proposed treatment plan involves a 21-day inpatient mental health treatment program, followed by 30 to 90 days of inpatient substance abuse treatment, and then outpatient behavioral health support treatment. Watson would be monitored by GPS tracking during his outpatient treatment. The court indicated the foregoing is the highest level of mental health care available in Santa Clara County for individuals who are neither in jail nor under a conservatorship. Watson would have additional support from friends, family, and the public defender's office.

A rational decision maker could conclude the proposed treatment plan was tailored to meet Watson's specialized needs. (Former § 1001.36, subd. (c)(1)(A).) The first inpatient treatment program would focus on treating depression, and the second inpatient treatment program would focus on treating substance abuse disorder. Thereafter, the outpatient treatment would allow Watson to continue receiving treatment while reintegrating into society with GPS monitoring. It is certainly possible that a treatment plan with greater periods of inpatient treatment could increase Watson's chance of

16

success in diversion. And another judge presented with the same facts could reasonably conclude that the proposed treatment plan would not meet Watson's specialized needs. But a reviewing court's test for abuse of discretion is whether the trial court exceeded the bounds of reason. (*Pacheco*, *supra*, 75 Cal.App.5th at p. 213.) On this record, the People have not demonstrated an abuse of discretion.

### III.    DISPOSITION

The petition for writ of mandate or prohibition is denied. Upon issuance of the remittitur, the temporary stay order is vacated.

17

_____

Grover, J.

**WE CONCUR:**

_____

Greenwood, P. J.

_____

Lie, J.

**H050025**
***The People v. Superior Court***